**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| UNITED ATLANTIC VENTURES, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 2024-0184-LWW |
| TMTG SUB INC. f/k/a TRUMP MEDIA & TECHNOLOGY GROUP CORP., TRUMP MEDIA & TECHNOLOGY GROUP CORP f/k/a DIGITAL WORLD ACQUISITION CORP., DONALD J. TRUMP, DEVIN G. NUNES, DONALD J. TRUMP, JR., KASHYAP "KASH" PATEL, DANIEL SCAVINO, JR., ERIC SWIDER, FRANK J. ANDREWS, EDWARD J. PREBLE, and JEFFREY A. SMITH, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted: May 15, 2025
Date Decided: September 2, 2025

Richard I. G. Jones, Jr., David B. Anthony & Harry W. Shenton IV, BERGER MCDERMOTT LLP, Wilmington, Delaware; Christopher Clark & Benjamin Dozier, CLARK SMITH VILLAZOR LLP, New York, New York; *Counsel for Plaintiff United Atlantic Ventures, LLC*

Theodore A. Kittila, M. Jane Brady, William E. Green, Jr. & John G. Harris, HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware; *Counsel for Defendants TMTG Sub Inc. f/k/a Trump Media & Technology Group Corp., President Donald J. Trump, and Daniel Scavino, Jr.*

John L. Reed & Ronald N. Brown, III, DLA PIPER LLP, Wilmington, Delaware; Caryn G. Schechtman, DLA PIPER LLP, New York, New York; Josh Halpern & M. David Josefovits, DLA PIPER LLP, Washington, DC; *Counsel for Defendants President Donald J. Trump, Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp., Devin G. Nunes, Donald J. Trump, Jr., Kashyap "Kash" Patel, Eric Swider, Frank J. Andrews, Edward J. Preble, and Jeffrey A. Smith*

**WILL, Vice Chancellor**

This case arises from a soured business relationship between United Atlantic Ventures (UAV) and Trump Media and Technology Group Corp. (TMTG), the operator of social media platform Truth Social.

In February 2021, then-former President Donald J. Trump hired UAV to consult on TMTG's launch in exchange for an 8.6% stake in the company. UAV's primary task was to position TMTG to access public markets. To that end, UAV identified a special purpose acquisition company (SPAC), Digital World Acquisition Corp. (DWAC), as a merger partner. Under an October 2021 merger agreement, legacy TMTG stockholders like UAV would receive shares in the newly-public combined company as merger consideration.

The merger was mired by delays until mid-2023. In the interim, Trump and UAV had a falling out. Though UAV was no longer involved with TMTG's business, it retained TMTG shares. In early 2024, TMTG purportedly authorized the issuance of one billion additional shares. Believing that was an attempt to dilute it, UAV filed this lawsuit in February 2024. TMTG responded with its own lawsuit in Florida, seeking to have the services agreement declared void.

The same month, DWAC disclosed that amendments to its charter would impose a 180-day lock-up, restricting all legacy TMTG stockholders from selling their new public shares after the merger closed. The focus of this lawsuit then

1

shifted, with UAV amending its complaint to claim the lock-up was retaliatory and contrary to Delaware law.

The merger closed and UAV received restricted shares, prompting yet another amended pleading. The defendants moved to dismiss that third amended complaint. This decision resolves the defendants' motions.

UAV's claims about the lock-up boil down to conspiracy theories unsupported by factual allegations. None are viable. DWAC's adoption of the lock-up by charter amendment before the combined company's shares were issued complied with Delaware statute. The restriction on target stockholders was neither unusual nor facially unreasonable in the de-SPAC merger context. And UAV pleads no facts suggesting that legacy TMTG's directors were involved in DWAC's adoption of the lock-up.

The two remaining claims about the services agreement are also dismissed, without prejudice. The services agreement has a Florida forum selection clause, and claims related to the agreement were first filed in Florida.

After briefing on the motions to dismiss was complete, the defendants moved for dismissal or a stay based on temporary presidential immunity following President Trump's reelection. Because UAV's complaint is dismissible on other grounds, I decline to reach the novel immunity question.

2

## I. BACKGROUND

Unless otherwise noted, the following facts are drawn from the Third Amended Verified Complaint (the "Complaint") and documents it incorporates by reference.[1]

### A. The Services Agreement

Plaintiff United Atlantic Ventures, LLC (UAV) is a Delaware limited liability company with its principal place of business in Fort Lauderdale, Florida.[2] In February 2021, then-former President Donald J. Trump and Trump Media LLC signed a Services Agreement with UAV, under which UAV would help establish Trump Media Group Corp. ("Legacy TMTG").[3] Trump signed on behalf of himself and Trump Media. Andy Litinsky, a UAV member, signed for UAV.[4]

UAV was to form Legacy TMTG as a Delaware corporation.[5] UAV would provide consulting services on "targeted media and technology opportunities in social media, internet infrastructure, podcast, digital streaming, mobile apps, book

---

[1] Third Am. Verified Compl. (Dkt. 142) ("Third Am. Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . .").

[2] Third Am. Compl. ¶ 17.

[3] *Id.* ¶ 32; *see id.* at Ex. B ("Services Agreement").

[4] Services Agreement 10 (signature page). Litinsky is a former "The Apprentice" contestant. *See Andy Dean*, Wikipedia, https://en.wikipedia.org/wiki/Andy_Dean (last visited Aug. 28, 2025).

[5] Services Agreement § 2.

publication, and television production" for the new entity.[6]  Legacy TMTG later launched Truth Social—a social media platform.[7]

The Services Agreement confirmed that "[t]he parties' primary goal [was] to position [Legacy TMTG] to access any of the private equity or public and private equity capital markets . . . [including through] a business combination with a [ SPAC]."[8]  It granted UAV "a perpetual and exclusive right to plan, coordinate, and finalize a [de-SPAC] transaction."[9]

The Services Agreement contemplated that Legacy TMTG would be formed with 100 million authorized shares of common stock.[10]  The shares were to be allocated among three stockholders: 90 million shares (90%) to Trump; 8.6 million shares (8.6%) to UAV; and 1.4 million shares (1.4%) to Bradford Cohen, an attorney who advised Trump on the Services Agreement.[11]  UAV's shares served as

---

[6] *Id.*

[7] *See* Third Am. Compl. ¶ 32.

[8] Services Agreement § 8; Third Am. Compl. ¶ 33.

[9] Third Am. Compl. ¶ 33; Services Agreement § 8.

[10] Third Am. Compl. ¶ 34; Services Agreement § 5.  The shares would have a par value of $.000001.

[11] Third Am. Compl. ¶ 34; Services Agreement § 5.

compensation for the consulting services it provided.[12]  UAV was also entitled to appoint two Legacy TMTG directors.[13]

UAV "set about forming [Legacy] TMTG and executing the business plan it had developed for [Legacy TMTG]."[14]

## B.     Legacy TMTG's Formation

On February 8, 2021, Legacy TMTG filed a certificate of incorporation in Delaware.[15]  It authorized the issuance of 11,000 shares of common stock, rather than the 100 million shares contemplated by the Services Agreement.[16]  It did not impose any restrictions on the shares.[17]

In June 2021, Legacy TMTG's three stockholders—Trump, UAV, and Cohen—passed several formative resolutions by unanimous written consent.[18] They ratified and approved Legacy TMTG's certificate of incorporation, set the number of directors on Legacy TMTG's Board of Directors at three, and appointed Trump

---

[12] Services Agreement § 9 ("Other than with respect to the reimbursement of its out-of-pocket expenses . . . UAV shall be entitled to no additional compensation above and beyond the 8,600,000 vested shares of common stock in TM[T]G . . . ."). The Services Agreement did not discuss restricting these shares. *See* Third Am. Compl. ¶ 35.

[13] Third Am. Compl. ¶ 37; Services Agreement § 16.

[14] Third Am. Compl. ¶ 40.

[15] *Id.* ¶ 42; *see id.* at Ex. C (Legacy TMTG certificate of incorporation).

[16] *Id.* ¶ 43.

[17] *Id.* ¶ 44; *id.* at Ex. C.

[18] *Id.* ¶¶ 45-46; *id.* at Ex. D ("June 2021 Resolutions").

and two UAV members—Litinsky and Wesley Moss—as directors.[19]  They also elected Litinsky, Moss, and Trump as Legacy TMTG's "Authorized Officers," and named Trump the company's President, Chief Executive Officer, and Secretary.[20]

The resolutions permitted the Authorized Officers to "sell and issue" 10,000 shares of Legacy TMTG common stock, with 9,000 shares (90%) to Trump, 860 shares (8.6%) to UAV, and 140 shares (1.4%) to Cohen.[21]

### C.    The October 2021 Resolutions

The next month, on July 30, 2021, The Trump Organization's Chief Legal Officer told Legacy TMTG's corporate counsel by email that the Services Agreement "was simply not what [Trump and Trump Media] understood they were agreeing to and that the actual terms of [the Services Agreement] had never been adequately explained to them prior to signing."[22]  The email, and an attached letter from Eric Trump, purported to declare the Services Agreement and any related agreements "*void ab initio*."[23]

---

[19] *Id.* ¶ 46; June 2021 Resolutions 1.  Like Litinsky, Moss is a former "The Apprentice" contestant. *Wes Moss*, IMDb, https://www.imdb.com/name/nm1724573/ (last visited Aug. 28, 2025).

[20] Third Am. Compl. ¶ 46; June 2021 Resolutions 2.

[21] Third Am. Compl. ¶ 46; June 2021 Resolutions 2.  This is the same allocation contemplated by the Services Agreement.  *See supra* note 11 and accompanying text.

[22] Third Am. Compl. Ex. J at Ex. 1; *see id.* ¶ 48.

[23] *Id.* ¶ 48; *see id.* Ex. J. at Ex. 1.

On October 13, 2021, the three Legacy TMTG Board members met and unanimously passed several resolutions.[24] They (1) changed the corporation's name to Trump Media & Technology Group Corp. (also "Legacy TMTG"), (2) authorized the filing of an amended and restated certificate of incorporation, and (3) increased the number of authorized shares to 110,000,000.[25]

### D. The Merger Agreement

On October 20, 2021, Legacy TMTG entered an Agreement and Plan of Merger (the "Merger Agreement") with Digital World Acquisition Corp. (DWAC), a SPAC.[26] The parties agreed that DWAC would combine with Legacy TMTG, bringing Legacy TMTG's business public as Trump Media & Technology Group Corp. ("New TMTG").[27]

The Merger Agreement stated that "[a]s consideration for the [m]erger," DWAC would amend its certificate of incorporation "in a form to be mutually agreed between [DWAC] and [Legacy TMTG]."[28] The amendment would occur "upon the Effective Time," defined as the time "the Certificate of Merger [was filed] . . . with

---

[24] *Id.* ¶¶ 51-53; *see id.* at Ex. E ("October 2021 Resolutions").

[25] *Id.* ¶ 53; October 2021 Resolutions 1-3.

[26] Third Am. Compl. ¶ 62; *see id.* at Ex. F ("Merger Agreement").

[27] Merger Agreement § 1.7. Legacy TMTG would merge into a subsidiary of DWAC, which was also a party to the Merger Agreement. *Id.* at 1.

[28] *Id.* § 1.7; Third Am. Compl. ¶ 63.

the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DGCL."[29]

The Merger Agreement also provided that all issued and outstanding shares of Legacy TMTG stock would be canceled at the Effective Time "in exchange for the right to receive the [s]tockholder [m]erger [c]onsideration," meaning the total DWAC shares payable to Legacy TMTG stockholders.[30] Legacy TMTG's stockholders—UAV, Trump, and Cohen—would be entitled to receive their pro rata merger consideration "upon delivery of the [t]ransmittal [d]ocuments" to the transfer agent.[31] DWAC was obligated to deposit the merger consideration with the transfer agent "[a]t or prior to the Effective Time."[32]

The Merger Agreement imposed a contractual lock-up on "Significant Company Holders"—those holding at least 10% of Legacy TMTG's issued and outstanding shares.[33] Any Significant Company Holder would enter into a lock-up agreement with DWAC, the form of which was Exhibit B to the Merger

---

[29] Merger Agreement § 1.7; *see id.* § 1.2 (defining "Effective Time").

[30] *Id.* § 1.9(a); Third Am. Compl. ¶ 65; *see also* Merger Agreement § 1.8(a) (defining "Stockholder Merger Consideration").

[31] Third Am. Compl. ¶ 65; Merger Agreement § 1.9(a); *see also* Third Am. Compl. ¶ 68.

[32] Third Am. Compl. ¶¶ 67, 69; Merger Agreement § 1.10(a); *see also id.* § 1.2 (defining "Effective Time").

[33] Third Am. Compl. ¶ 74; Merger Agreement 2 (Recital F); *id.* § 11.1 (defining "Significant Company Holder").

Agreement.[34]  Under the Lock-Up Agreement, the Significant Company Holder could not sell or transfer New TMTG stock during specified periods.[35]  Because UAV had only an 8.6% stake,[36] it was not a Significant Company Holder subject to the contractual lock-up.[37]

E.    The Amended Merger Agreement

The merger was delayed by, among other things, a Securities and Exchange Commission (SEC) investigation.[38]  It was "placed back on track" in mid to late 2023.[39]

Meanwhile, in March 2022, Trump allegedly asked Litinsky to transfer a portion of UAV's Legacy TMTG stock to his spouse, Melania Trump.[40]  When Litinsky refused, Trump purportedly directed Devin Nunes—then Legacy TMTG's

---

[34] Merger Agreement 2 (Recital F); *see* Third Am. Compl. Ex. G ("Form of Lock-Up Agreement").

[35] A Significant Company Holder would be barred from selling during the period "ending on the earliest of (x) the six-months after the date of the Closing, (y) the date on which the closing price of the Purchaser Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any twenty (20) trading days within any thirty (30) trading day period commencing at least one-hundred fifty (150) days after the Closing."  Form of Lock-Up Agreement § 1(a); *see* Third Am. Compl. ¶ 76.

[36] *See supra* notes 11, 21 and accompanying text.

[37] Third Am. Compl. ¶ 75.

[38] *Id.* ¶ 78.

[39] *Id.*

[40] *Id.* ¶ 59.

CEO—to remove Litinsky from the Legacy TMTG Board.[41] UAV's other Board designee, Moss, later resigned after "[Legacy] TMTG intentionally walled [him] off."[42]

At some point, Nunes, Kashyap "Kash" Patel, Daniel Scavino, Jr., and Donald J. Trump, Jr. served as directors of Legacy TMTG.[43]

On August 9, 2023, DWAC and Legacy TMTG amended the Merger Agreement.[44] The amendment granted Trump high vote common stock representing 55% of New TMTG's voting power.[45] The amendment did not contemplate additional lock-ups or restrictions on the sale or trading of New TMTG stock after closing.[46]

---

[41] *Id.*

[42] *Id.* ¶ 61.

[43] *Id.* ¶¶ 21-24. UAV does not specify the dates on which any of these individuals joined or departed the Legacy TMTG Board.

[44] *Id.* ¶ 79; *id.* at Ex. H ("Second Am. to Merger Agreement").

[45] Third Am. Compl. ¶¶ 80-84; Second Am. to Merger Agreement § 1(k) (providing for "the creation of the Purchaser High Vote Common Stock to be issued to the Company Principal . . . [which] shall entitle its holder to a number of votes equal to the greater of (i) one vote and (ii) the number of votes that would cause the aggregate number of shares issued to the Company Principal as consideration in the Merger (excluding any Earnout Shares) to represent 55% of the voting power"); *see also* Merger Agreement § 11.1 (defining "Company Principal" as "former President Donald J. Trump").

[46] Third Am. Compl. ¶ 85.

**F.     DWAC's Registration Statement**

On January 18, 2024, UAV advised DWAC that its December 2023 Form S-4 Registration Statement omitted to mention UAV's rights under the Services Agreement.[47]  Four days later, on January 22, DWAC filed an amended Form S-4 stating that the Services Agreement had been "declared void nearly two and a half years previously" by The Trump Organization.[48]  Also on January 22, Legacy TMTG stockholder Cohen served a Section 220 books and records demand on Legacy TMTG, seeking information about his ownership interests.[49]

On January 26—eight days after UAV's letter and four days after Cohen's Section 220 demand—Legacy TMTG filed a third amended and restated certificate of incorporation with the Delaware Secretary of State.[50]  The amended certificate authorized the issuance of one billion shares of common stock, 900 million (90%) of which were designated voting stock with the remaining 100 million (10%) non-voting stock.[51]  Those additional shares were never issued.

---

[47] *Id.* ¶ 87.

[48] *Id.* ¶ 90; *id.* at Ex. I (Jan. 18, 2024 letter); *see supra* notes 22-23 and accompanying text (discussing the Trump Organization's July 2021 letter).

[49] Third Am. Compl. ¶ 97; *id.* at Ex. L (Cohen's Section 220 demand).

[50] Third Am. Compl. ¶ 94.

[51] *Id.*

**G. The Lock-Up**

DWAC filed additional amendments to its Registration Statement with the SEC.[52] In its fourth amended Registration Statement dated February 12, "DWAC disclosed that it would adopt post-[m]erger charter amendments to lock-up certain stock" (the "Lock-Up").[53] DWAC's charter would be amended to:

> include Lock-Up Trading Restrictions, which shall apply to holders who received New Digital World common stock in exchange for their [Legacy] TMTG common stock, but excluding shares of New Digital World common stock issued to holders of [Legacy] TMTG common stock, which were issued by [Legacy] TMTG prior to the Closing in exchange for their TMTG Convertible Notes.[54]

DWAC's proposed amended charter was attached (the "Second Amended Charter").[55]

---

[52] *Id.* ¶ 107; Digit. World Acq. Corp., Am. No. 6 to Registration Statement (Form S-4) (Feb. 14, 2024) ("DWAC Sixth Am. Registration Statement"); *see also* Third Am. Compl. Ex. K (Excerpt, Sixth Am. Registration Statement); Third Am. Compl. ¶¶ 101-02.

[53] Third Am. Compl. ¶ 102; *see* Digit. World Acq. Corp., Am. No. 4 to Registration Statement (Form S-4) (Feb. 12, 2024) ("Fourth Am. Registration Statement").

[54] Third Am. Compl. ¶ 102; Fourth Am. Registration Statement 142, 173; *see also* Third Am. Compl. ¶ 101 (noting that the Lock-Up was not disclosed in the initial Registration Statement or the first three amended Registration Statements). The fifth and sixth amendments to the Registration Statement—both filed on February 14—also disclosed this Lock-Up. *Id.* ¶ 107; *see* Digit. World Acq. Corp., Am. No. 5 to Registration Statement (Form S-4) (Feb. 14, 2024) 143, 175, 328; Sixth Am. Registration Statement 143, 175, 328.

[55] Fourth Am. Registration Statement, Annex B; *see also id.* at 2.

The Lock-Up was again disclosed in the fifth and sixth amendments to DWAC's Registration Statement. "Amendment No. 6 was approved by the SEC on February 14 and became DWAC's final [R]egistration [S]tatement."[56]

## H.    The Delaware Litigation

On February 29, 2024, UAV filed this action against Legacy TMTG.[57]  It sought declarations that (a) it owned 8.6% of Legacy TMTG's issued and outstanding stock; (b) the authorization of the one billion shares in Legacy TMTG's third amended certificate of incorporation was invalid; and (c) UAV maintained an anti-dilution right under the Services Agreement.[58]  It also sought related injunctive relief.[59]

UAV amended its complaint a week later.[60]  It added individual defendants Trump, Nunes, Trump, Jr., Patel, and Scavino, Jr.—each in their capacities as Legacy TMTG directors.[61]  UAV claimed that those individuals breached their fiduciary duties regarding the purported "dilution scheme."[62]

---

[56] Third Am. Compl. ¶ 107.

[57] Verified Compl. (Dkt. 1).

[58] *Id.* ¶¶ 81-97.

[59] *Id.* ¶¶ 98-107.

[60] First Am. Compl. (Dkt. 13).

[61] *Id.* ¶¶ 19-23.

[62] *Id.* ¶¶ 151-63; *see supra* notes 50-51.

## I.    Closing

On March 22, 2024, DWAC's stockholders approved the business combination with Legacy TMTG.[63]  They also voted to adopt the Second Amended Charter, including the Lock-Up.[64]

The Second Amended Charter states that "the Locked-up Holders may not Transfer any Lock-up Shares until the end of the Lock-up Period."[65]  "Lock-up Shares" are "the shares of capital stock [] of [New TMTG] received by the stockholders of [Legacy] TMTG, excluding[] shares of capital stock of [New TMTG] issued in exchange for [Legacy] TMTG shares that were issued by [Legacy] TMTG to holders of Company Convertible Notes."[66]  "Locked-up Holders" are "the holders of Lock-up Shares."[67]

---

[63] Third Am. Compl. ¶ 108.

[64] *Id.* ¶¶ 108, 113; *see* Opening Br. of Defs. TMTG, Nunes, Trump, Jr., Patel, Swider, Andrews, Preble, and Smith in Supp. of Mot. to Dismiss Verified Third Am. Compl. (Dkt. 176) ("New TMTG Defs.' Opening Br.") Ex. D ("Second Am. Charter") § 4.8.

[65] Third Am. Compl. ¶ 113 (quoting Second Am. Charter § 4.8(a)).  Section 4.8(a) excludes permitted transfers under Section 4.8(b).  Second Am. Charter § 4.8(a).

[66] Second Am. Charter § 4.8(c); *see* Third Am. Compl. ¶ 113.

[67] Second Am. Charter § 4.8(c); *see* Third Am. Compl. ¶ 113.

A Certificate of Merger was filed with the Delaware Secretary of State at 8:19 a.m. on March 25.[68] The Second Amended Charter was filed four minutes later, at 8:22 a.m.[69]

## J. UAV's Restricted Shares

UAV promptly sent its letter of transmittal to New TMTG's transfer agent, entitling it to merger consideration.[70] On March 28, UAV learned that it owned 7,472,141 restricted shares of New TMTG stock.[71] The shares were "subject to the limitations on transfer and lock-up restrictions described in section 4.8 of the [Second Amended Charter]."[72]

## K. The Florida and Delaware Litigation

On March 24—the night before the merger with DWAC closed—New TMTG sued UAV, UAV members Litinsky and Moss, and DWAC's former director and officer Patrick Orlando in the Circuit Court for the Twelfth Judicial Circuit in and for Sarasota County, Florida Civil Division (the "Sarasota Action").[73] New TMTG sought "(1) a declaration that UAV has no contractual rights to appoint members of

---

[68] Third Am. Compl. ¶ 110.

[69] *Id.* ¶ 112.

[70] *Id.* ¶ 109.

[71] *Id.* ¶ 116.

[72] *Id.*

[73] *Id.* ¶ 122; *see id.* at Ex. A ("Sarasota Action Compl.").

TMTG's Board of Directors or to own shares in [New TMTG]; (2) restitution of the shares issued to UAV (or their value) that UAV failed to earn; [and] (3) damages for Moss and Litinsky's breaches of fiduciary duty in their management of [TMTG] and for Orlando's active involvement and participation in those breaches."[74]

The Sarasota Action promoted activity in the Delaware suit. On April 2, UAV moved for leave to file a second amended complaint in this court, which was granted.[75] UAV's second amended complaint added claims about the Lock-Up imposed by New TMTG's Second Amended Charter.[76] It also named five new defendants: New TMTG, Eric Swider (a former DWAC and current New TMTG director), and three other New TMTG Directors.[77]

The Sarasota Action was stayed on June 27 in deference to this action.[78] New TMTG and Legacy TMTG then filed another lawsuit in Sarasota (the "Second Sarasota Action") that was assigned to a different Florida judge.[79] Their allegations

---

[74] Sarasota Action Compl. ¶ 5; *see also* Third Am. Compl. ¶ 123.

[75] Dkts. 57, 100.

[76] Second Am. Compl. (Dkt. 81).

[77] *Id.* ¶¶ 23-25. The other new individual defendants were W. Kyle Green, Linda McMahon, and Robert Lighthizer. UAV also asserted that Nunes, Patel, and Trump, Jr. were directors of New TMTG. *Id.* ¶¶ 17-21.

[78] Letter from UAV's Counsel (Dkt. 138) Ex. A ("Sarasota Action Stay Op.") 5.

[79] *See* Letter from UAV's Counsel (Dkt. 160). Legacy TMTG was now called TMTG Sub Inc. The defendants were DWAC's former officer and director Orlando and DWAC's sponsor ARC Global Investments II, LLC.

are similar to those in the original Sarasota Action.[80]  Although UAV was not named as a defendant in the Second Sarasota Action, the plaintiffs sought to enjoin UAV from selling certain New TMTG shares after the expiration of the Lock-Up.[81]  The Florida court declined to dismiss or stay the Second Sarasota Action in deference to this action, or to consolidate it with the original Sarasota Action.[82]

Back in Delaware, UAV sought leave to file a third amended complaint, which was unopposed.[83]  That operative Complaint was filed on July 9, 2024.  UAV expanded its allegations about the Lock-Up and breaches of fiduciary duty, and added claims for aiding and abetting breaches of fiduciary duty and civil conspiracy. It also dropped certain New TMTG directors as defendants,[84] replacing them with three former DWAC directors: Orlando (who was later dismissed from the suit), Frank J. Andrews, Edward J. Preble, and Jeffrey A. Smith.[85]

---

[80] *Compare id.* at Ex. A ("Second Sarasota Action Inj. Mot.") ¶ 5, *with* Sarasota Action Compl. ¶¶ 23, 52(b)-(c).

[81] Second Sarasota Action Inj. Mot. 2 (stating that "UAV cannot be permitted to sell [its] . . . locked-up shares of TMTG").

[82] UAV's Reply in Further Supp. of Mot. for Contempt (Dkt. 155) Ex. C (order of the Florida court).

[83] *See* Order Granting Mot. for Leave to File Third Am. Compl. (Dkt. 141).

[84] Green, McMahon, and Lighthizer were dropped.  *See supra* note 77.

[85] Third Am. Compl. ¶¶ 26-39; *see* Notice of Voluntary Dismissal of Def. Patrick F. Orlando (Dkt. 174).

Two sets of defendants moved to dismiss the Complaint in October.[86]  UAV

filed an answering brief in November.[87]  Reply briefs were filed in December.[88]

While briefing was underway, Trump was reelected to his second term as

President of the United States, taking office on January 20, 2025.[89]  A few days later,

the defendants moved for a stay on the basis of temporary presidential immunity.[90]

On May 15, after the immunity motion was fully briefed,[91] oral argument was

presented on both sets of motions.[92]  The motions were taken under advisement.

---

[86] *See* Opening Br. of Defs. TMTG Sub Inc., President Trump, and Scavino, Jr. in Supp. of Mot. to Dismiss Third Am. Compl. (Dkt. 175) ("Legacy TMTG Defs.' Opening Br."); New TMTG Defs.' Opening Br. (defined *supra* note 64).

[87] Pl.'s Answering Br. in Opp'n to Defs.' Mots. to Dismiss Third Am. Verified Compl. (Dkt. 179) ("Pl.'s Answering Br.").

[88] Reply Br. of Defs. TMTG, Nunes, Trump, Jr., Patel, Swider, Andrews, Preble, and Smith in Further Supp. of Mot. to Dismiss Verified Third Am. Compl. (Dkt. 192) ("New TMTG Defs.' Reply Br."); Reply Br. of Defs. TMTG Sub Inc., President Trump, and Scavino, Jr. in Further Supp. of Mot. to Dismiss Third Am. Verified Compl. (Dkt. 191) ("Legacy TMTG Defs.' Reply Br.").

[89] *See In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (providing that the court may take judicial notice of "facts . . . not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))).

[90] Defs.' Mot. to Dismiss, or Alternatively, to Stay on Basis of Temporary Presidential Immunity (Dkt. 195).

[91] Pl.'s Opp'n to Defs.' Mot. to Dismiss, or Alternatively, to Stay on Basis of Temporary Presidential Immunity (Dkt. 213); Reply in Further Supp. of Defs.' Mot. to Dismiss, or Alternatively, to Stay on Basis of Temporary Presidential Immunity (Dkt. 215).

[92] Tr. of May 15, 2025 Oral Arg. on Defs.' Mots. to Dismiss (Dkt. 223) ("Hr'g Tr.").

## II. ANALYSIS

UAV's Complaint advances eight counts. The first five counts concern the Lock-Up, with theories ranging from violations of the Delaware General Corporation Law (DGCL) to breach of fiduciary duty and conspiracy. The sixth and seventh counts concern the validity and enforceability of the Services Agreement. And the eighth count seeks an anti-suit injunction of the Sarasota Action.

The defendants move for the dismissal of all counts on various grounds. They assert that UAV states no claim on which relief can be granted under Court of Chancery Rule 12(b)(6). For the Services Agreement-related claims, they argue that a forum selection provision warrants dismissal under Court of Chancery Rules 12(b)(1) and 12(b)(3), or that the claims should be dismissed in deference to the Sarasota Action.

In the alternative, the defendants ask that I dismiss or stay this case while President Trump remains in office. "[I]mmunity questions should be decided at the earliest possible stage of the litigation."[93] Still, "[a] fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."[94] In keeping with that wise

---

[93] *Clinton v. Jones*, 520 U.S. 681, 686 (1997).

[94] *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988); *see also Kajmowicz v. Whitaker*, 42 F.4th 138, 153-54 (3d Cir. 2022) (observing the importance of

policy, the defendants have asked that I first consider their other dismissal-related arguments, which were fully briefed before President Trump began his second term.[95]

As such, I first address the Rule 12(b)(6) motion on the Lock-Up-related claims and conclude that each are legally insufficient. I then turn to the Services Agreement-related claims and dismiss them without prejudice under Rule 12(b)(3) and in deference to the Sarasota Action. Because UAV declined to brief its anti-suit injunction claim, it is dismissed as waived.[96]

None of UAV's claims survive. I therefore decline to address the issue of presidential immunity.[97]

## A.     Claims Regarding the Lock-Up

UAV brings six claims regarding the Lock-Up. Count I is a claim against New TMTG that the Lock-Up violates 8 *Del. C.* § 202.[98] Count II, brought against New TMTG in the alternative to Count I, is a claim that the Lock-Up violates 8 *Del.*

---

courts adhering to "principles of constitutional avoidance and judicial restraint," "no matter how novel, significant, or interesting" the question presented may be).

[95] *See* Hr'g Tr. 15-16.

[96] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[97] *See supra* note 94 and accompanying text.

[98] Third Am. Compl. ¶¶ 150-71.

*C.* § 151.[99]  In Counts III and IV, UAV alleges that Legacy TMTG's directors breached their fiduciary duties by causing the Lock-Up, aided and abetted by New TMTG and DWAC's former directors.[100]  Count V is a civil conspiracy claim against all defendants regarding the Lock-Up.[101]

The defendants have moved to dismiss these claims under Rule 12(b)(6).  In resolving those motions, I must "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party."[102]  But I am "not required to accept every strained interpretation of [UAV's] allegations."[103]  Nor must I accept conclusory assertions "unsupported by allegations of specific facts."[104]

---

[99] *Id.* ¶¶ 172-80.

[100] *Id.* ¶¶ 181-85 (alleging a breach of fiduciary duty claim against Nunes, Trump, Jr., Patel, Trump, and Scavino, Jr.); *id.* ¶¶ 186-91 (alleging an aiding and abetting claim against New TMTG, Swider, Andrews, Preble, and Smith).

[101] *Id.* ¶¶ 192-96.

[102] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[103] *Gen. Motors (Hughes)*, 897 A.2d at 168 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

[104] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom.*, *Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

1.     Section 202

In Count I, UAV claims that the Lock-Up in the Second Amended Charter is invalid for failure to comply with Delaware law.[105]  Section 202(b) of the Delaware General Corporation Law provides:

> A restriction on the transfer or registration of transfer of securities of a corporation, or on the amount of a corporation's securities that may be owned by any person or group of persons, may be imposed by the certificate of incorporation or by the bylaws or by an agreement among any number of security holders or among such holders and the corporation.  No restrictions so imposed shall be binding with respect to securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction.[106]

Restrictions on the transfer of stock must also be "reasonable to achieve a legitimate business purpose," given the "traditional judicial policy favoring the free transfer of securities."[107]

UAV maintains that the Lock-Up violates Delaware law in two ways.  First, the Lock-Up allegedly contravenes "the strict statutory requirements of [Section] 202."[108]  Second, even if Section 202(b) were complied with, the Lock-Up is

---

[105] Third Am. Compl. ¶¶ 151-71.

[106] 8 *Del. C.* § 202(b).

[107] *Cap. Gp. Cos. v. Armour*, 2005 WL 678564, at *5, *8 (Del. Ch. Mar. 15, 2005).

[108] Third Am. Compl. ¶ 151; *see also* Pl.'s Answering Br. 28-32.

allegedly unreasonable because it was added "for purposes of retaliating against UAV."[109]  Neither contention supports a reasonably conceivable claim.

### a.      Section 202(b)'s Requirements

Section 202(b) permits a corporation to impose transfer restrictions through its charter.  A restriction is not binding on "securities issued prior to the adoption" of the charter unless the affected securityholders consent to it.[110]  UAV's members never consented to the Lock-Up, which was approved by DWAC stockholders.  Thus, the pertinent question is whether UAV was "issued" its New TMTG stock after the "adoption" of the Second Amended Charter.

UAV asserts that its New TMTG stock was issued before the Lock-Up was adopted.[111]  Its argument is as follows.  Under the Merger Agreement, all shares of Legacy TMTG stock were canceled at the Effective Time and Legacy TMTG stockholders gained the right to a pro rata share of New TMTG stock worth $875 million.[112]  The Effective Time was when the Certificate of Merger was filed with the Delaware Secretary of State, at 8:19 a.m. on March 25, 2024.[113]  The Merger Agreement provides that at or before the Effective Time, New TMTG would deposit

---

[109] Third Am. Compl. ¶ 167; *see also* Pl.'s Answering Br. 21-22.

[110] 8 *Del. C.* § 202(b); *see supra* note 106 (quoting Section 202(b)).

[111] *See* Pl.'s Answering Br. 28-29.

[112] Third Am. Compl. ¶ 68; *see supra* notes 30-31 and accompanying text.

[113] Third Am. Compl. ¶ 110; *see id.* ¶ 71; Merger Agreement § 1.

the merger consideration with its transfer agent.[114]  The Second Amended Charter

was filed four minutes after the Effective Time, at 8:22 a.m.  Based on this sequence,

UAV posits that the stock was "issued" (i.e., delivered to the transfer agent) before

the Lock-Up was "adopted" (i.e., when the Second Amended Charter was filed in

Delaware).

The defendants argue that UAV's position is baseless for two reasons.  First,

it improperly conflates the effectiveness and adoption of the Second Amended

Charter.[115]  And second, it is "based on a false distinction between when [UAV]

thinks it was issued its shares" (at the Effective Time) and "when it was actually

issued its shares" (after the Second Amended Charter was filed).[116]  I agree.

The defendants' interpretation of Section 202 is the only reasonable one.  The

Second Amended Charter was adopted, for purposes of Section 202, when DWAC's

stockholders voted to approve it.  UAV's claim fails on that basis alone.  Even if

adoption arguably occurred on March 25, UAV's claim would still fail because its

---

[114] Third Am. Compl. ¶ 69; Merger Agreement § 1.10(a) ("At or prior to the Effective Time, [New TMTG] shall deposit, or cause to be deposited, with the [Transfer] Agent the Stockholder Merger Consideration . . . .").

[115] New TMTG Defs.' Opening Br. 16-17; *see also* New TMTG Defs.' Reply Br. 7-9.

[116] New TMTG Defs.' Opening Br. 15; *see also id.* at 19-20; New TMTG Defs.' Reply Br. 5-7.

shares were not issued until after the Second Amended Charter was filed, which I address below in the context of UAV's Section 151 claim.[117]

> i.     *The Meaning of "Adoption"*

"It is axiomatic that a statute or an ordinance is to be interpreted according to its plain and ordinary meaning."[118]   "Where a statute contains unambiguous language that clearly reflects the intent of the legislature, then the language of the statute controls."[119]   Undefined terms "must be given their ordinary, common meaning," and should not be "construed as surplusage if there is a reasonable construction which will give them meaning."[120]

In Section 202(b), "adoption" is undefined and unambiguous.[121]   "Delaware courts look to dictionaries for assistance in determining the plain meaning of terms

---

[117] *See infra* Section II.A.2.

[118] *New Cingular Wireless PCS v. Sussex Cnty. Bd. of Adjustment*, 65 A.3d 607, 611 (Del. 2013); *see also Chase Alexa, LLC v. Kent Cnty. Levy Ct.*, 991 A.2d 1148, 1151 (Del. 2010) (noting that if a statute is unambiguous, the "plain meaning of the statutory language controls" (citation omitted)).

[119] *State Farm Mut. Auto. Ins. v. Kelty*, 126 A.3d 631, 635 (Del. 2015) (quoting *Hoover v. State*, 958 A.2d 816, 820 (Del. 2008)).

[120] *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994); *see also Wilson v. Gingerich Concrete & Masonry*, 285 A.3d 445, 452 (Del. 2022) (same).

[121] Pl.'s Answering Br. 30; *see also* 8 *Del. C.* § 202(b).  Although there "may be more than one dictionary definition, and parties may disagree on the meaning of the definition as applied to their case," if "merely applying a definition in the dictionary suffices to create ambiguity, no term would be unambiguous." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) (citation omitted).

25

which are not undefined . . . ."[122] Black's Law Dictionary defines "adoption" as a "deliberative assembly's act of agreeing to a motion or the text of a resolution, order, rule, or other paper or proposal."[123] Merriam-Webster similarly defines adoption as "the act or process of giving official acceptance or approval to something."[124] In both definitions, the adoption of an item is based on a body's agreement to or approval of it.

The words surrounding "adoption" in Section 202(b) reinforce that the relevant act is the agreement or approval of a body. "The canon of *noscitur a sociis* requires the court to interpret words as part of the larger phrase in which they appear."[125] The first sentence of Section 202(b) states that restrictions may be imposed by the certification of incorporation, the bylaws, or "an agreement among

---

[122] *Cephas v. State*, 911 A.2d 799, 801 (Del. 2006) (citation omitted); *see also Freeman v. X-Ray Assocs., P.A.*, 3 A.3d 224, 227 (Del. 2010) ("Because dictionaries are routine reference sources that reasonable persons use to determine the ordinary meaning of words, we often rely on them for assistance in determining the plain meaning of undefined terms."); *cf. Andrews v. State*, 34 A.3d 1061, 1063 (Del. 2011) (noting that words in the criminal code should be given their common meaning unless otherwise defined).

[123] *Adoption,* Black's Law Dictionary (12th ed. 2024) (defined under parliamentary law).

[124] *Adoption*, Merriam-Webster, http://merriam-webster.com/dictionary/adoption (last visited Aug. 18, 2025).

[125] *Agar v. Judy*, 151 A.3d 456, 473 (Del. Ch. 2017).

26

any number of security holders."[126]  Each of these methods to create a restriction requires a form of approval—by the board of directors, the stockholders, or both.[127]

Section 202 treats adoption and effectiveness as distinct concepts.  Section 202(b) discusses the "adoption" of a restriction.[128]  Section 202(a), by contrast, addresses when a restriction may be "enforced" or is "ineffective."[129]  Delaware courts must "give meaning to every word in [a] statute" and presume that "the General Assembly purposefully chose particular language."[130]  "[W]hen different terms are used in various parts of a statute[,] it is reasonable to assume that a distinction between the terms was intended."[131]

UAV's argument therefore finds no support in the text of Section 202.  The "adoption" of a restriction involves the agreement or approval of a body of actors.

---

[126] *See* 8 *Del. C.* § 202(b).

[127] *See id.* § 242(b)(1) (noting that the "board of directors shall adopt a resolution setting forth the amendment proposed" before "calling a special meeting of the stockholders"); *id.* § 109(a) (noting that "the power to adopt, amend, or repeal bylaws shall be in the stockholders entitled to vote[,]" but that a "corporation may, in its certificate of incorporation, confer the power to adopt . . . upon the directors").

[128] *Id.* § 202(b).

[129] *Id.* § 202(a) ("A written restriction . . . if permitted by this section and noted conspicuously . . . may be *enforced* . . . ." (emphasis added)); *id.* ("Unless noted conspicuously . . . a restriction . . . is *ineffective*." (emphasis added)).

[130] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 117-18 (Del. 2020) (quoting *Sussex Cty. Dep't of Elections v. Sussex Cty. Republican Comm.*, 58 A.3d 418, 422 (Del. 2013)).

[131] *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982) (quoting *C & T Assocs. v. Gov't of New Castle*, 408 A.2d 27, 29 (Del. Ch. 1979)).

Applied here, the Lock-Up was adopted for purposes of Section 202(b) on March 22, 2024, when DWAC stockholders voted to approve the Second Amended Charter.

        ii.        *UAV's Misguided Focus on Effectiveness*

UAV further submits that "under Delaware law, a charter amendment is not enforceable against a shareholder until it becomes effective, which occurs upon filing with the Secretary of State."[132] That point is uncontroversial.[133] It is also irrelevant.

A charter amendment's adoption is distinct from its effectiveness upon filing.[134] An amended certificate of incorporation must be adopted before it can be lawfully filed.[135] Here, the Second Amended Charter became effective on March 25 when it was filed with the Secretary of State, which was three days after its adoption.

---

[132] Pl.'s Answering Br. 32.

[133] *See* 8 *Del. C.* § 106 (providing that a corporation's existence begins upon the filing of the certificate of incorporation with the Delaware Secretary of State, subject to Section 103(d)); *id.* § 103(d) (permitting the use of future effective dates); *see also* New TMTG Defs.'s Opening Br. 16.

[134] *See, e.g.*, *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 438 (Del. 2005) (recounting a stockholder purchase agreement in which the adoption and filing of a certificate of incorporation are listed as separate, sequential acts); *cf. Waggoner v. Laster*, 581 A.2d 1127, 1131 (Del. 1990) (noting that one issue presented was whether an amendment to articles of incorporation was adopted though "a valid certificate of incorporation" had been filed); *Belanger v. Fab Indus., Inc.*, 2005 WL 1076064, at *1 (Del. Ch. May 2, 2005) (stating that a corporation "ha[d] adopted by proper shareholder vote[] a plan of dissolution . . . [which allowed it] to sell all or substantially all of the corporation's assets once a certificate of dissolution has been filed").

[135] *See* 1A *Fletcher Cyclopedia of the Law of Corporations* § 161 (Sept. 2025 Update) (explaining that "[c]ourts have found the filing of articles of incorporation ineffectual" where the articles were "fil[ed] without adoption or authorization by a majority of

UAV's misdirection is not salvaged by the precedent it relies on. The cited cases concern a charter amendment's effectiveness or enforceability.[136] None address the adoption of a charter amendment for purposes of Section 202(b).

incorporators"); *cf.* 8 *Del. C.* § 241(b) ("The amendment of a certificate of incorporation authorized by this section shall be adopted by a majority of the incorporators, if directors were not named in the original certificate of incorporation or have not yet been elected, or, if directors were named in the original certificate of incorporation or have been elected and have qualified, by a majority of the directors."); *id.* § 245(b) ("If the restated certificate of incorporation merely restates and integrates but does not further amend the certificate of incorporation . . . it may be adopted by the board of directors without a vote of the stockholders, or it may be proposed by the directors and submitted by them to the stockholders for adoption, in which case the procedure and vote required, if any, by § 242 of this title for amendment of the certificate of incorporation shall be applicable."); *id.* ("If the restated certificate of incorporation restates and integrates and also further amends in any respect the certificate of incorporation . . . it shall be proposed by the directors and adopted by the stockholders in the manner and by the vote prescribed by § 242 of this title or, if the corporation has not received any payment for any of its stock, in the manner and by the vote prescribed by § 241 of this title."); *id.* § 245(c) (noting that a restated certificate of incorporation could be "adopted by the board of directors without a vote of the stockholders").

[136] Pl.'s Answering Br. 31-32 (citing cases); *see Aldridge v. Franco Wyoming Oil Co.*, 14 A.2d 380, 381 (Del. 1940) (holding that a voting right was unauthorized because of the absence of legal authority behind a charter amendment rather than issues around its filing or adoption); *Belanger*, 2005 WL 1076064, at *1 (discussing when a certificate of dissolution becomes effective under 8 *Del. C.* § 103); *Di Loreto v. Tiber Holding Corp.*, 1999 WL 1261450, at *7 (Del. Ch. June 29, 1999) (holding that a company was estopped from invoking Section 202 to nullify a buyback provision when it neglected to timely file and give notice of the charter amendment, causing current stockholders to rely on a prior version to their detriment); *Seavitt v. N-Able, Inc.*, 321 A.3d 516, 550 (Del. Ch. 2024) (rejecting a corporation's incorporation of private agreements into its charter); *Henry v. Phixios Hldgs., Inc.*, 2017 WL 2928034, at *9 (Del. Ch. July 10, 2017) (holding that a stock restriction was invalid in part because it was not noted on the stock certificate, and acknowledging that "a stock transfer restriction may be binding on existing securities through . . . inclusion in the certificate of incorporation").

Finally, UAV argues that public policy supports treating the adoption of a charter amendment under Section 202(b) as the moment of its filing.[137] UAV suggests that filing is the pertinent event so that "shareholders have knowledge of restrictions before acquiring their stock" and "information about the corporation [is made] available to investors and third parties."[138] This, too, is unavailing. The point ignores that all stockholders of New TMTG (then DWAC)—the only stockholders entitled to vote on the Second Amended Charter—knew of the restriction when they approved it.[139]

During the three days between its approval by stockholders (March 22) and its filing (March 25), the Second Amended Charter was ineffective. It became *effective* once it was filed with the Secretary of State. But it was necessarily *adopted* before then.[140]

---

[137] *See* Pl.'s Answering Br. 30-32.

[138] *Id.* at 31-32; *see also id.* at 31 (arguing that to allow DWAC stockholders to adopt a charter they are "not even subject to . . . makes little sense").

[139] The Second Amended Charter also became public as an exhibit to the Certificate of Merger. *See* New TMTG Defs.' Opening Br. Ex. F

[140] On top of its adoption argument, UAV contends that the Lock-Up violates Section 202(b) because UAV was "issued its stock when the Certificate of Merger was filed." Pl.'s Answering Br. 29. This is incorrect. As I discuss later in this decision, issuance means receipt—not when the shares are deposited with the transfer agent. *See infra* Section II.A.2.

### b. Legitimate Business Purpose

In addition to compliance with Section 202, Delaware law requires that restrictions on the transfer of stock be "reasonable to achieve a legitimate corporate purpose."[141]  Before Section 202's enactment in 1967, Delaware courts upheld transfer restrictions if they were reasonable.[142]  Although the passage of Section 202 created "some uncertainty" over the relevance of this requirement, the Court of Chancery in *Grynberg v. Burke* confirmed that the statute was a "modern codification" of these common law principles.[143]  Decades later, in *Capital Group Companies v. Armour*, the court "reaffirm[ed] the holding in *Grynberg* that a

---

[141] *Cap. Gp.*, 2005 WL 678564, at *8.

[142] *See Lawson v. Household Fin. Corp.*, 152 A. 723, 728-29 (Del. 1930) (upholding a right of first refusal as reasonable and therefore valid); *Greene v. E.H. Rollins & Sons*, 2 A.2d 249, 251-53 (Del. Ch. 1938) (suggesting that a charter provision allowing the company to repurchase shares at net asset value might be invalid as unrelated to the company's "successful operation"); *see also Cap. Gp.*, 2005 WL 678564, at *5 (describing this historical approach); *Capano v. Wilmington Country Club*, 2001 WL 1359254, at *7 (Del. Ch. Nov. 1, 2001) (same).

[143] *Grynberg v. Burke*, 378 A.2d 139, 142-43 (Del. Ch. 1977), *rev'd on other grounds*, *Oceanic Expl. Co. v. Grynberg*, 428 A.2d 1 (Del. 1981).  Several Court of Chancery decisions after *Grynberg* further confirmed the reasonableness requirement implicit in Section 202.  *See Mitchell Assocs. v. Mitchell*, 1980 WL 268106, at *2 (Del. Ch. Dec. 5, 1980) (citing *Grynberg* for the proposition that "a restriction on transfer is still required to be reasonable under [8] *Del. C.* § 202 even if in technical conformity to the statute"); *Capano*, 2001 WL 1359254, at *7-8 (applying the common law test to conclude that restrictions on country club share ownership were reasonable); *see also supra* note 144 and accompanying text.

reasonableness inquiry is required when restrictions on the transfer of stock are contested."[144]

UAV submits that the Lock-Up should be struck down as "unreasonable, manifestly unjust, and serv[ing] no legitimate business purpose."[145]  As the party with the burden of proving the Lock-Up's unreasonableness, it faces a formidable challenge.[146]  The reasonableness inquiry is one "broadly deferential" to the corporation, and the court must avoid "excessively scrutiniz[ing] the reasonableness of the restriction."[147]

---

[144] *Cap. Gp.*, 2005 WL 678564, at \*7.  This conclusion is bolstered by the legislature's choice to leave Section 202 largely intact after *Grynberg*, despite making other changes to the statute.  *See PHL Var. Ins. v. Price Dawe 2006 Ins. Tr. ex rel. Christiana Bank & Tr. Co.*, 28 A.3d 1059, 1070 (Del. 2011) ("Courts should . . . interpret statutory law consistently with pre-existing common law unless the legislature expresses a contrary intent.").  *Grynberg* was issued in 1977, and Section 202 was subsequently amended in 1983 and 1999.  *See* 64 Del. Laws, c. 112, §§ 19-20; 72 Del. Laws, c. 123, § 4.  Section 202 was amended once more in 2017.  81 Del. Laws, c. 86, § 2.  The only changes were to replace the word "sent" with "given" in Section 202(a).  *Id.*

[145] Third Am. Compl. ¶ 160; *see* Pl.'s Answering Br. 21-28.

[146] *See Cap. Gp.*, 2005 WL 678564, at \*7; *Grynberg*, 378 A.2d at 143; *see also Agranoff v. Miller*, 1999 WL 219650, at \*16-17 (Del. Ch. Apr. 12, 1999) (citing *Grynberg* for the proposition that "the burden of proving the unreasonableness of a restriction on the free transferability of shares is on the party attacking it"), *aff'd*, 737 A.2d 530, 1999 WL 636634 (Del. July 28, 1999) (ORDER).

[147] *Cap. Gp.*, 2005 WL 678564, at \*8; *see also Agranoff,* 1999 WL 219650, at \*16 ("Delaware public policy generally empowers market participants to decide for themselves whether to enter into contracts restricting their right to sell their shares.").

Section 202(e) permits any "lawful" restriction on transfers of securities.[148] To be lawful, a transfer restriction must not violate Delaware statutory law, or a public policy settled by common law.[149] A restriction will be upheld if it is "reasonably necessary to advance the corporation's welfare or attain the objectives set forth in the corporation's charter."[150]

The allegations in the Complaint are insufficient to meet this standard. UAV does not assert that the Lock-Up was unreasonable as a general matter. Rather, it accepts that transfer restrictions were warranted for some Legacy TMTG stockholders, such as Trump and current Legacy TMTG insiders. UAV merely insists that the Lock-Up was a "bad faith" act of retaliation against it and Cohen.[151]

UAV suggests that the Lock-Up served no legitimate purpose because its "practical effect" was to restrict Legacy TMTG's minority stockholders.[152] The

---

[148] 8 *Del. C.* § 202(e) ("Any other lawful restriction on transfer or registration of transfer of securities, or on the amount of securities that may be owned by any person or group of persons, is permitted by this section.").

[149] *See* Robert S. Saunders et al., *Folk on the Delaware General Corporation Law* § 202.04 (7th ed. 2025-2 supp.) ("Since the statute clearly evinces a forceful legislative policy supporting needed transfer restrictions, the common law in Delaware should be liberally construed to sustain restrictions that the corporation and its stockholders deem appropriate." (citing *Folk*, § 202 (1st ed. 1972)); *see also Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 117-18 (Del. 1952) (explaining that "lawful" does not only mean permitted by statute).

[150] *Cap. Gp.*, 2005 WL 678564, at *5.

[151] *See* Third Am. Compl. ¶ 167.

[152] Pl.'s Answering Br. 27.

Merger Agreement already gave DWAC the right to lock up the post-merger stock of Trump and other Legacy TMTG insiders.[153] UAV thus postulates that the additional Lock-Up must have been designed to harm it and Cohen. It points out that the Lock-Up was first announced in DWAC's fourth amended Registration Statement on February 12, 2024—after UAV's counsel sent its January 18 letter accusing New TMTG of making false disclosures in the Registration Statement and Cohen served his Section 220 demand.[154]

UAV's theory misapprehends the nature of the reasonableness inquiry. Under Delaware law, transfer restrictions "need not be the least restrictive alternative that the board could adopt. They need only be reasonable."[155] The court's inquiry is not whether a restriction is reasonable as applied to a specific stockholder, but whether it is facially reasonable to achieve a legitimate corporate purpose.[156]

---

[153] *See* Third Am. Compl. ¶ 161; *see* Merger Agreement 2 (Recital F); Merger Agreement § 11.1 (defining "Significant Company Holder").

[154] Third Am. Compl. ¶ 101 ("Neither the original [Form] S-4 nor the Amendments Nos. 1, 2, or 3 provide that DWAC would adopt the [] Lock-Up provisions post-[m]erger that would apply to UAV and lock-up UAV's stock."); *see also id.* ¶¶ 92, 97, 102; *supra* notes 47, 53 and accompanying text.

[155] *Cap. Gp.*, 2005 WL 678564, at *9.

[156] *See id.* at *8-9 (rejecting the plaintiff's argument that the court should consider whether a "stock transfer restriction [was] reasonable as it applie[d] to a particular individual"); *see also Greene*, 2 A.2d at 253 (examining whether restrictions were facially reasonable); *Tracy v. Franklin*, 67 A.2d 56, 59-60 (Del. 1949) (assessing the validity of a stock restriction in general, and not as applied to a particular stockholder).

There is no well-pleaded basis on which I can reasonably infer that the Lock-Up unreasonably served no legitimate corporate end. Transfer restrictions on SPAC insiders and target securityholders are common in de-SPAC mergers.[157] Such restrictions can prevent an oversupply of stock on the market after closing, stabilizing the company's stock price during a period of volatility.[158]

When target stockholders receive the combined company's publicly traded shares at a low-cost basis, they may sell immediately after closing to realize a quick

---

[157] *See Brown v. Matterport*, 2024 WL 2745822, at *4 (Del. Ch. May 28, 2024) (describing a similar lock-up in a SPAC's amended bylaws that applied to all target stockholders for 180 days after a business combination closed), *aff'd and rev'd in part on other grounds*, 2025 WL 1166116 (Del. Apr. 22, 2025) (ORDER); *see also Market Trends: De-SPAC Transactions*, LexisNexis (Mar. 6, 2022), https://www.lexisnexis.com /community/insights/legal/practical-guidance-journal/b/pa/posts/market-trends-de-spac-transactions (describing "notable" de-SPAC transactions, and highlighting that target stockholders were subject to transfer restrictions); *SPAC Transactions – Considerations for Target-Company CFOs*, Deloitte & Touche LLP & Cooley LLP, https://www.cooley.com/-/media/cooley/pdf/reprints/2020/cobranded-spac-transactions--considerations-for-targetcompany-cfos-secured.pdf (last visited Sept. 1, 2025) (observing that "the typical lock-up period for target shareholders is 180 days from closing" of a de-SPAC); New TMTG Defs.' Opening Br. 21 (citing sources); *cf. Special Purpose Acquisition Companies: An Introduction*, Harv. L. Sch. F. on Corp. Governance (July 6, 2018), https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction (discussing the ubiquitousness of lock-ups in the SPAC context); Usha Rodrigues & Mike Stegemoller, *Exit, Voice, and Reputation: The Evolution of SPACs*, 37 DEL. J. CORP. L. 849, 873 (2013) ("Post-acquisition, sponsor shares are often subject to a lock-up period.").

[158] *Cf. Initial Public Offerings: Lockup Agreements*, SEC (Sept. 6, 2011), https://www.sec.gov/answers/lockup.htm (noting that companies typically impose lock-ups to ensure "that shares owned by . . . insiders don't enter the public market too soon"); John C. Coffee, Jr. & Joshua Mitts, *Can Section 11 Be Saved?: "Tracing" A Path to Its Survival*, 15 HARV. BUS. L. REV. 2, 5 (2025) ("[L]ockups limit the supply of stock that can enter the market after the effective date . . . .").

profit. An early sell-off by the target's insiders and early investors risks downward pressure on the stock price, impairing market confidence and future capital raising.[159] Lock-ups lessen this risk by creating an orderly process for SPAC insiders and the target's former stockholders to sell over time.[160] This maintains a stable market for the newly-public company's stock, benefiting the corporation and all stockholders.

The Lock-Up here bears an obvious relation to such purposes. It prevented "Locked-Up Holders"—all Legacy TMTG stockholders—from transferring the New TMTG shares they received as merger consideration for six months after closing.[161] The fourth amended Registration Statement explained that locking up certain Legacy TMTG stockholders "would provide important stability to the

---

[159] *See* Paul J. Shim, et al., *Delaware Court of Chancery Finds Lock-Up Inapplicable in de-SPAC Transaction*, Cleary Gottlieb (Jan. 20, 2022), https://www.clearymawatch.com/2022/01/delaware-court-of-chancery-finds-lock-up-inapplicable-in-de-spac-transaction/ ("Given frequent share price volatility both pre- and post-combination, lock-ups are a critical element of de-SPAC transactions . . . ."); *cf.* Coffee & Mitts, *supra* note 158, at 5 ("[L]ockups limit the supply of stock . . . increasing the likelihood of a positive runup in the stock price . . . ."); Cooley LLP, *Early Lock-Up Releases: Overview and Trends*, Cooley CapitalXchange (Jan. 20, 2025), https://capx.cooley.com/2025/01/20/early-lock-up-releases-overview-and-trends/ ("The theory is that, without lock-ups, existing stockholders could sell their shares shortly after the offering, potentially oversupplying the market with shares, [and] depressing the share price . . . ultimately hurt[ing] the . . . investors.").

[160] *Cf.* Coffee & Mitts, *supra* note 158, at 5 ("Lockups reassure investors that, at least for a given period of time, insiders are not bailing out, but retain significant 'skin in the game.'").

[161] Second Am. Charter § 4.8(a).

leadership and governance of TMTG," and noted that the Second Amended Charter would contain additional restrictions.[162]

Even so, UAV asks that I look beneath the veneer of reasonableness to assess whether malintent prompted the Lock-Up. It cites no basis in our law to inject a good faith analysis into the review of a transfer restriction's facial reasonableness.[163] Even if there were, UAV cannot avoid the reality that DWAC—not Legacy TMTG—is the entity that amended its charter to enact the Lock-Up. There is not a single fact pleaded to suggest that DWAC undertook the Lock-Up for an illicit motive.[164] Nor are there any well-pleaded allegations that Legacy TMTG and its directors caused DWAC to adopt the Lock-Up.[165]

---

[162] Fourth Am. Form S-4 at 42.

[163] UAV's argument that the Lock-Up was adopted in bad faith forms the core of its breach of fiduciary duty claim, which I resolve below. *See infra* Section II.A.3. UAV also complains that considering whether transfer restrictions facially serve reasonable business purposes improperly "injects factual allegations" at the pleading stage. Pl.'s Answering Br. 38-39. Not so. The court may consider secondary authorities in assessing the prevalence of the transfer restriction. *See, e.g.*, *In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 56 n.97 (Del. 2022) (citing a textbook with respect to an appeal of a motion to dismiss decision); *Ryan v. Gifford*, 918 A.2d 341, 356 n.38 (Del. Ch. 2007) (considering public sources, including an article from the SEC's website, on a motion to dismiss).

[164] As discussed below, UAV alleges that the Merger Agreement "required DWAC and [Legacy] TMTG, with approval from both boards of directors, to *agree* upon a form of Amended Charter, which DWAC was required to adopt." Third Am. Compl. ¶ 63; *see infra* Section II.A.3. The Merger Agreement required only that DWAC "amend and restate its Certificate of Incorporation in a form to be mutually agreed between [DWAC] and [Legacy TMTG]" to provide for the entity's name change, the size and structure of the post-closing Board, and to remove provisions related to DWAC's former SPAC status. Merger Agreement § 1.7.

[165] *See infra* notes 182-185 and accompanying text.

UAV's conspiracy theories attacking the Lock-Up are directed at Legacy TMTG, which did not impose the Lock-Up. The Lock-Up's benefits to DWAC and its stockholders, however, are apparent from the face of the Second Amended Charter. Under precedent and the legislative policy animating Section 202, there is no reasonably conceivable basis to conclude that the Lock-Up is unlawful.[166]

### 2. Section 151

In Count II, UAV avers that if I conclude the Lock-Up "was adopted prior to UAV['s] shares being issued, the [] Lock-Up as imposed on UAV's shares violates 8 *Del. C.* § 151."[167] Section 151(a), which authorizes and governs the issuance of classes of corporate stock, provides:

> Every corporation may issue 1 or more classes of stock or 1 or more series of stock within any class thereof, any or all of which classes may be of stock with par value or stock without par value and which classes or series may have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, *and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the certificate of incorporation or of any amendment thereto*, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by the provisions of its certificate of incorporation.[168]

---

[166] *See supra* note 146 and accompanying text (citing case law explaining that it is the plaintiff's burden to show unreasonableness).

[167] Third Am. Compl. ¶¶ 172-80; *see* Pl.'s Answering Br. 21, 33.

[168] 8 *Del. C.* § 151(a) (emphasis added).

UAV believes that the statute was violated because the Lock-Up was not "clearly and expressly set forth" in the Second Amended Charter when UAV's New TMTG shares were issued.[169]

As with its Section 202 claim, UAV's reading of Section 151(a) is divorced from Delaware law. UAV asserts that its New TMTG shares were issued "at 8:19 a.m. on March 25, 2024, [the Effective Time] when UAV's pro rata share of the [m]erger [c]onsideration was deposited with the [t]ransfer [a]gent," which occurred before the Second Amended Charter "was filed at 8:22 am on March 25, 2024."[170] But no New TMTG shares were issued to UAV at the merger's Effective Time.

"Issue" means to "emit," "send out," or put stock in "circulation."[171] To be deemed issued, stock must "not only pass[] from the custody and control of the

---

[169] Pl.'s Answering Br. 21 ("[W]hen UAV's stock was issued, the then[-]effective Charter did not contain any stock restrictions and, therefore, no restrictions existed on UAV's stock when it was issued."); *id.* at 33 ("If Defendants are correct that the [c]harter [l]ock-[u]p was adopted on March 22, 2024, when UAV's stock was issued upon the filing of the Certificate of Merger at 8:19 am on March 25, 2024, the then-existing and operative Charter did not include the lock-up restrictions on UAV's stock.").

[170] Third Am. Compl. ¶¶ 175-76; *see* Pl.'s Answering Br. 30.

[171] *Anardarko Petroleum Corp. v. Panhandle E. Corp*, 1987 WL 13520, at *4 (Del. Ch. July 7, 1987) (quoting *Scott v. Abbott*, 160 F. 573, 577 (8th Cir. 1908)); *see also* Saunders et al., *supra* note 149, § 152.05 ("The Court of Chancery has stated that stock is deemed issued when it actually or constructively comes into the possession of the stockholder by delivery to him or to some person acting as his agent."); 11 *Fletcher Cyclopedia of the Law of Corporations*, *supra* note 134, § 5126 ("'To issue' means to send out, to put in circulation."); *supra* notes 118-120 and accompanying text (discussing that statutes are interpreted according to the plain meaning of their terms).

[corporation] but also [be] delivered into the possession of the stockholder."[172]  At the Effective Time, UAV only became "entitled to receive . . . a number of" New TMTG shares as "[m]erger [c]onsideration."[173]

The transfer agent did not—and could not—issue shares to UAV in the three-minute window between the filing of the Certificate of Merger (i.e., the Effective Time) and of the Second Amended Complaint.  The post-merger shares were issued after the Second Amended Charter, which "stated and expressed" the Lock-Up, was filed.[174]  And whatever the timing, UAV's shares were issued with a restrictive legend reflecting the Lock-Up.[175]

Because the Lock-Up was in the Second Amended Charter when UAV received its restricted stock, Count II is dismissed.

---

[172] *Smith v. Universal Serv. Motors Co.*, 147 A. 247, 249 (Del. Ch. 1929); *see also Danvir Corp. v. Wahl*, 1987 WL 16507, at *5 (Del. Ch. Sept. 8, 1987).  Although "constructive or symbolic delivery" can satisfy the delivery requirement to issue stock, it is typically an exception for when "actual transfer of physical possession of a certificate is impractical." *McAllister v. Kallop*, 1995 WL 462210, at *16 (Del. Ch. July 28, 1995), *aff'd*, 678 A.2d 526 (Del. 1996).  That is not the case here.

[173] Merger Agreement § 1.8; *see also id.* § 1.9 ("[A]ll shares of Company Stock issued and outstanding immediately prior to the Effective Time will automatically be cancelled and cease to exist in exchange for the right to receive the Stockholder Merger Consideration … upon delivery of the Transmittal Documents in accordance with Section 1.10 . . . .").

[174] 8 *Del. C.* § 151(a) (requiring that "special rights, and qualifications, limitations or restrictions" on stock "shall be stated and expressed in the certificate of incorporation").

[175] Third Am. Compl. ¶ 116.

### 3. Breach of Fiduciary Duty

Count III is a breach of fiduciary duty claim against Nunes, Trump Jr., Patel, Trump, and Scavino Jr., who served on Legacy TMTG's Board.[176] Those directors purportedly breached their fiduciary duties to UAV by, "pursuant to an agreement with New TMTG, caus[ing] the [Lock-Up] to be included in New TMTG's Second Amended Charter."[177] Doing so was purportedly a breach of the Legacy TMTG Board's duty of loyalty because the directors "act[ed] in bad faith and with discriminatory and retaliatory purposes."[178]

There are multiple problems with this claim, including the failure to plead its most basic elements: (1) a fiduciary relationship and (2) a breach of the fiduciary's duty.[179] The DWAC Board owed no fiduciary duty to UAV when the Lock-Up was adopted. As for the Legacy TMTG Board that owed duties to UAV, the Complaint does not mention a single action taken in connection with the Lock-Up.

First, when the Lock-Up was disclosed in DWAC's Registration Statement and adopted, UAV was a stockholder of Legacy TMTG. The Legacy TMTG Board

---

[176] *Id.* ¶¶ 21-24, 181; *see supra* note 43 (explaining that UAV does not specify which directors were on the board and when).

[177] Third Am. Compl. ¶ 182.

[178] *Id.* ¶ 183.

[179] *Est. of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011) ("To establish liability for the breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed her a fiduciary duty and that the defendant breached it.").

owed fiduciary duties to UAV. Even if it could be reasonably inferred that the Lock-Up was adopted in bad faith,[180] the DWAC Board—not the Legacy TMTG Board—approved the Lock-Up.[181]

UAV's duty of loyalty claim rests on an untenable leap. From a general Merger Agreement clause requiring the parties to "mutually agree[]" on an amended charter,[182] UAV asks me to infer a multi-step scheme in which Legacy TMTG's Board proposed the Lock-Up to harm UAV and DWAC's Board agreed to it at Legacy TMTG's request. The Complaint is devoid of facts to support this narrative.[183] UAV not only neglects to identify the directors who allegedly acted disloyally, but also cites no action by any director that could constitute a breach.[184] It does not even allege that Legacy TMTG and DWAC agreed to the Second Amended Charter.

---

[180] By making this assumption for the sake of my analysis, I am not concluding that UAV adequately pleaded bad faith.

[181] *See* Third Am. Compl. ¶ 63.

[182] Merger Agreement § 1.7; *see* Third Am. Compl. ¶ 63.

[183] *See Alston v. Admin. Off. of the Cts.*, 181 A.3d 614, 2018 WL 1080606, at *1 (Del. Feb. 23, 2018) (ORDER) ("Well-pleaded allegations include specific allegations of fact and conclusions supported by specific allegations of fact."); *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *2 (Del. Ch. Oct. 17, 2007) (rejecting a "bald assertion" without any facts pleaded in support as insufficient), *aff'd sub nom.*, *Int'l Bhd. Teamsters v. Coca-Cola Co.*, 954 A.2d 910 (Del. 2008).

[184] UAV never identifies which directors were on the Legacy TMTG Board when the Lock-Up was adopted. *See supra* note 43. It also engages in impermissible group pleading. *See* Legacy TMTG Defs.' Opening Br. 16 (citing sources).

Second, it was DWAC's Board that included the Lock-Up in the Second Amended Charter, disclosed it in the Registration Statement, and presented it to DWAC's stockholders for approval. At that point, UAV was a future stockholder, and no fiduciary duties were owed to it by DWAC's Board.[185]

### 4. Aiding and Abetting

Count IV is an aiding and abetting claim against the members of DWAC's Board and New TMTG. To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[186]

UAV alleges that "[w]ith knowledge of the fiduciary duties owed by the [Legacy] TMTG Board to UAV, New TMTG and [the DWAC directors] actively participated in and aided and abetted breaches of fiduciary duty by the [Legacy] TMTG Board by, among other things, agreeing with [Legacy] TMTG to impose the [] Lock-Up on UAV."[187] The claim fails for lack of an underlying breach. As discussed above, UAV has not demonstrated that the members of Legacy TMTG's

---

[185] *Anadarko*, 545 A.2d at 1177 (holding that no fiduciary duties are owed to "prospective stockholders").

[186] *In re Mindbody, Inc. S'holder Litig.*, 332 A.3d. 349, 389 (Del. 2024) (quoting *Malpiede*, 780 A.2d at 1096).

[187] Third Am. Compl. ¶¶ 188-89.

43

Board breached their fiduciary duties in connection with DWAC's adoption of the Lock-Up.

### 5. Civil Conspiracy

Count V is a civil conspiracy claim that, like the fiduciary duty and aiding and abetting claims, stems from the imposition of the Lock-Up. A civil conspiracy claim requires "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage."[188] "[I]n the absence of an actionable wrong, a civil conspiracy claim will fail."[189]

UAV alleges that "[Legacy] TMTG, New TMTG, and their respective directors . . . entered into a confederation and conspired with one another to impose [the Lock-Up] in violation of Sections 202 and 151 of the DGCL and Delaware law."[190] In its brief, UAV explains that its civil conspiracy claim "relies on the same factual allegations underlying its aiding and abetting" claim.[191] But I have rejected UAV's claims under the DGCL and for breach of fiduciary duty. Without an

---

[188] *AeroGlobal*, 871 A.2d at 437 n.8 (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987)).

[189] *Clouser v. Doherty*, 175 A.3d 86, 2017 WL 3947404, at *9 (Del. Sept. 7, 2017) (ORDER).

[190] Third Am. Compl. ¶ 193.

[191] Pl.'s Answering Br. 52.

underlying wrong over which the defendants purportedly conspired, the conspiracy claim likewise fails.[192]

## B.    Claims Regarding the Services Agreement

UAV's final claims are for declaratory judgments related to the Services Agreement. Count VI seeks a declaration that "Old TMTG approved and ratified the Services Agreement" such that "New TMTG is now estopped from claiming that the Services Agreement is void and unenforceable."[193] Count VII seeks a declaration that the Services Agreement remains valid and enforceable despite The Trump Organization's statement that it was void.[194]

I dismiss those claims without prejudice for two reasons. First, a forum selection clause in the Services Agreement requires that the claims be brought in Palm Beach County, Florida. Second, the claims are better addressed in the pending Sarasota Action.

---

[192] *See Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998) (explaining that "civil conspiracy is not an independent cause of action . . . it must arise from some underlying wrong").

[193] Third Am. Compl. ¶ 199; *see also id.* ¶¶ 197-201.

[194] *Id.* ¶¶ 202-08; *see supra* note 22 and accompanying text.

1. Dismissal for Improper Venue

In addition to arguments on the merits, the defendants move to dismiss Counts VI and VII under Court of Chancery Rules 12(b)(1) and 12(b)(3).[195] The Services Agreement contains a forum selection clause, which chooses courts in Palm Beach County, Florida.[196] "The proper procedural rubric for addressing a motion to dismiss based on a forum selection clause is found under Rule 12(b)(3), improper venue."[197] Under Rule 12(b)(3), the Court of Chancery "will grant a motion to dismiss based upon a forum selection clause where the parties 'use express language clearly indicating that the forum selection clause excludes all other courts before which those parties could otherwise properly bring an action.'"[198]

a. The Forum Selection Clause

"When a contract contains a forum selection clause, this court will interpret the forum selection clause in accordance with the law chosen to govern the contract."[199] "Delaware courts will generally honor a contractually-designated

---

[195] *See* Dkts. 148-49 (moving to dismiss the Third Amended Complaint under Rules 12(b)(1), 12(b)(3), and 12(b)(6)).

[196] *See infra* note 208 and accompanying text (quoting the forum selection clause).

[197] *Baker v. Impact Hldg., Inc.*, 2010 WL 1931032, at *2 (Del. Ch. May 13, 2010); *see also Simon v. Navellier Series Fund*, 2000 WL 1597890, at *1 (Del. Ch. Oct. 19, 2000).

[198] *Ashall Homes Ltd. v. ROK Entm't Gp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010) (quoting *Eisenbud v. Omnitech Corp. Sols., Inc.*, 1996 WL 162245, at *1 (Del. Ch. Mar. 21, 1996)).

[199] *Ashall*, 992 A.2d at 1245.

choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."[200] A material relationship may exist where a party's principal place of business is in the selected state.[201]

The Services Agreement is governed by Florida law.[202] Each of the signatories to the Services Agreement listed Florida addresses as their residences.[203] The entity that the Services Agreement contemplated forming—TMTG—is headquartered in Sarasota, Florida.[204] The Services Agreement therefore has a material relationship to Florida.

As in Delaware, "Florida courts recognize the right of contracting parties to select and agree on a forum in which to resolve future disputes."[205] Forum selection clauses are presumptively valid, unless the challenging party can show that

---

[200] *J.S. Alberici Const. Co. v. Mid-W. Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000); *Annan v. Wilm. Tr. Co.*, 559 A.2d 1289, 1293 (Del. 1989).

[201] *E.g.*, *Shadewell Grove IP, LLC v. Mrs. Fields Franchising, LLC*, 2006 WL 1375106, at *7 (Del. Ch. May 8, 2006).

[202] Services Agreement § 23 ("This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida without regard to principles of conflicts of law.").

[203] *See id.* at 1 (listing Trump's address as Palm Beach, Florida; Trump Media's address as Fort Lauderdale, Florida; and UAV's address as Fort Lauderdale, Florida). On a Rule 12(b)(3) motion, the court may consider facts and evidence outside the complaint. *See In re Bay Hills Emerging P'rs I, L.P.*, 2018 WL 3217650, at *4 (Del. Ch. July 2, 2018).

[204] *See* Trump Media & Technology Group Corp., Annual Report (Form 10-K) (Apr. 1, 2024) 1 (listing a Sarasota, Florida address for the company's principal executive office).

[205] *Travel Exp. Inv. Inc. v. AT & T Corp.*, 14 So. 3d 1224, 1226 (Fla. Dist. Ct. App. 2009).

enforcement would be unreasonable or unjust.[206]  As the party seeking to avoid the clause, UAV "must demonstrate that trial in the agreed-upon forum 'will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court.'"[207]

Enforcement often hinges on whether the forum selection clause's terms are mandatory or permissive.  The forum selection provision clause at issue here states that "any" disputes about the Services Agreement "shall" be resolved in Florida:

> *Any* dispute arising from or relating to this Agreement *shall* be resolved in the federal courts of the United States of America for the Southern District of Florida or the courts of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida and all parties hereby expressly and irrevocably consent to the personal jurisdiction and venue of such courts.[208]

"[F]orum selection clauses which state or clearly indicate that any litigation must or shall be initiated in a specified forum are mandatory."[209]

---

[206] *See Manrique v. Fabbri*, 493 So. 2d 437, 440 (Fla. 1986) (holding that "forum selection clauses should be enforced in the absence of a showing that enforcement would be unreasonable or unjust"); *see also Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010) ("Forum selection[] clauses are 'presumptively' valid and should be 'specifically' enforced unless the resisting party '. . . clearly show[s] that enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud and overreaching." (quoting *Cap. Gp. Cos. v. Armour,* 2004 WL 2521295, at *3 (Del. Ch. Oct. 29, 2004))).

[207] *Am. Patriot Brands, Inc. v. Skip Jack APB Hldg., LLC*, 320 So. 3d 322, 325 (Fla. Dist. Ct. App. 2021) (quoting *McWane, Inc. v. Water Mgmt. Servs., Inc.*, 967 So. 2d 1006, 1007 (Fla. Dist. Ct. App. 2007)).

[208] Services Agreement § 23 (emphasis added).

[209] *Shoppes Ltd. P'ship v. Conn*, 829 So. 2d 356, 358 (Fla. Dist. Ct. App. 2002).

UAV's declaratory judgment claims both "arise from" and "relate[] to" the Services Agreement. In contrast to its claims about the Lock-Up, Counts VI and VII solely concern the validity and enforceability of the Services Agreement. UAV was therefore required to bring these claims in Palm Beach County, Florida based on the clear terms of the forum selection clause.

### b. Waiver

UAV does not assert that the forum selection clause resulted from fraud or deceit, would contravene a significant public policy of Florida (or Delaware), or would deprive it of its day in court if enforced.[210] It instead maintains that the clause was waived when Legacy TMTG filed the Sarasota Action, claiming that UAV lacked enforceable rights under the Services Agreement. Sarasota, Florida is not in Palm Beach County—the venue selected by the forum selection clause. But Legacy TMTG, which filed the Sarasota Action, is not a party to the Services Agreement.

Even if Legacy TMTG could be viewed as so closely related to the Services Agreement that it foresaw being bound by the forum clause,[211] Trump may enforce

---

[210] *See Manrique*, 493 So. 2d at 438, 440.

[211] *See Deloitte & Touche v. Gencor Indus., Inc.*, 929 So. 2d 678, 684 (Fla. Dist. Ct. App. 2006) ("[W]here the interests of a non-party are directly related to or completely derivative of those of the contracting party, the non-signatory is bound by the contract's forum selection clause."); *Venus Concept USA, Inc. v. Angelic Body, LLC*, 362 So. 3d 258, 264 (Fla. Dist. Ct. App. 2023) ("We are . . . guided by the factors outlined in *Deloitte & Touche*, which consider whether: there is a close relationship between the signatory and nonsignatories; the nonsignatories' interests are derivative of the signatory's interests; and

the forum selection clause. Like UAV, he is a party to the Services Agreement. He did not, however, file claims in Sarasota that waived the clause.[212]

UAV insists that Trump should be deemed to have waived the clause because he "controls" Legacy TMTG and must have consented to the filing of the Sarasota Action.[213] It cites no authority for the notion that a company's actions bind its controlling stockholder for purposes of waiving a forum selection clause.[214] Legacy TMTG is a distinct legal person from its owners.[215]

*      *      *

The Services Agreement, to which UAV and Trump are parties, contains a mandatory forum selection clause. Legacy TMTG's filing of the Sarasota Action

---

the claims involving the nonsignatories arise directly out of the agreement."). UAV does not make this argument. I consider it for the sake of thoroughness.

[212] The defendants invoke a non-waiver provision in the Services Agreement, which states that "[t]he parties understand and agree that no failure to or delay by any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise of any right, power, or privilege hereunder shall preclude any other or further exercise of any right, power, or privilege." Services Agreement ¶ 24. That language addresses language by omission—not commission. It does not provide that Legacy TMTG's filing of the Sarasota Action was a non-waiver for purposes of this suit.

[213] Pl.'s Answering Br. 54-57.

[214] In Delaware, the standard for proving waiver is "quite exacting." *AeroGlobal*, 871 A.2d at 444. It requires "knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing [certain] contractual rights." *Id.*

[215] *Cf. Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1109 (Del. Ch. 2008) ("Even though every stockholder of a corporation may change, the corporation maintains its own identity in perpetuity, because it is a separate and distinct legal entity from its shareholders.").

did not waive the forum selection clause as to Trump, who may continue to enforce it. Dismissal is therefore warranted under Rule 12(b)(3).

### 2. Dismissal in Deference to Florida

The defendants also request the dismissal or stay of this action in favor of the Sarasota Action, citing the *McWane* doctrine.[216] Under *McWane*, this court may exercise its discretion to stay an action "when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues."[217] "If the foreign action is not 'first-filed,' the Court will pursue an inquiry 'akin to a *forum non conveniens* analysis.'"[218]

When this action was filed on February 29, 2024, UAV did not sue on the Services Agreement.[219] Old TMTG then filed the Sarasota Action on March 24, 2024.[220] Weeks later, on April 11, UAV filed its Second Amended Complaint, which raised the Services Agreement for the first time in Delaware.[221]

---

[216] *See* Legacy TMTG Defs.' Opening Br. 36-40; Legacy TMTG Defs.' Reply Br. 29-30.

[217] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281, 284 (Del. 1970).

[218] *Cnty of York Emps. Ret. Plan v. Merrill Lynch & Co.*, 2008 WL 4824053, at *2 (Del. Ch. Oct. 28, 2008) (quoting *Biondi v. Scrushy*, 820 A.2d 1140, 1159 (Del. Ch. 2003)).

[219] *See* Dkt. 1.

[220] *See* Pl.'s Answering Br. Ex. I (Sarasota Action complaint).

[221] Second Am. Verified Compl. (Dkt. 81).

If UAV's amended claims about the Services Agreement "relate back" to its original complaint, then this case would be treated as first filed for *McWane* purposes.[222] They do not. Although UAV's original complaint discussed the Services Agreement as background, no count so much as mentioned the Services Agreement.[223] In seeking expedition of this case, UAV represented that it was "not suing on the Services Agreement."[224] For *McWane* purposes, the Sarasota Action was the first suit filed over the Services Agreement.

Under *McWane*, "Delaware courts should exercise discretion in favor of a stay where a prior action, involving the same parties and issues, is pending elsewhere in a court capable of doing prompt and complete justice."[225] The Sarasota Action is a prior action regarding the Services Agreement. It involves UAV's purported rights under the Services Agreement—the same issues raised in Counts VI and VII here.

---

[222] *See Choice Hotels Int'l, Inc. v. Columbus-Hunt Park DR. BNK Invs., L.L.C.*, 2009 WL 3335332, at *6-7 (Del. Ch. Oct. 15, 2009) (noting that where the substance of a case remains the same, the "court will treat the modified action as if filed on the original date").

[223] *See* Dkt. 1.

[224] Pl.'s Reply in Further Supp. of Mot. for Expedited Proceedings (Dkt. 31) ¶ 26 ("As Defendants know, Plaintiff is not suing on the Services Agreement, nor is TMTG a party to the Services Agreement. UAV is suing for its rightful share of TMTG stock as established by valid and enforceable Board and stockholder resolutions. Plaintiff also seeks to rescind the Dilution Scheme based on breaches of fiduciary duty.").

[225] *Ingres*, 8 A.3d at 1145.

The parties are not identical but overlap.[226] Most critically, the Florida court is more than capable of doing prompt and complete justice in addressing a contract that selects Florida law.

UAV does not dispute that deference to the Sarasota Action is appropriate under *McWane*. It argues that it would be "disorderly, inefficient, and inconsistent with principles of comity, the underlying policy of *McWane*, to send this dispute back to Florida" when the Sarasota Action was stayed in deference to Delaware.[227] Circumstances were different, though, when the Florida court stayed the Sarasota Action. This case was proceeding apace, with several claims expedited.[228]

The current situation is quite different. The gravamen of this case is about the Lock-Up. Each of UAV's claims about the Lock-Up are dismissed for failure to state a claim. Only two claims about the Services Agreement remain to be resolved.[229] In the Sarasota Action, there are multiple causes of action focused on the validity of the Services Agreement.

There is no compelling reason for UAV's claims about the Services Agreement to proceed here rather than in Florida. The Florida court has a strong

---

[226] *See Davis Int'l, LLC v. New Start Gp. Corp.*, 2005 WL 2899683, at *2 (Del. Ch. Oct. 27, 2005) (discussing that "substantial or functional identity" of the parties may be sufficient to support a stay under *McWane*).

[227] Pl.'s Answering Br. 57; *see id.* at Ex. M ("Florida Stay Order").

[228] *See* Florida Stay Order 4-5.

[229] To be clear, I have not considered whether these claims are viable.

interest in resolving a dispute between parties with their principal places of business in Florida that involves issues of Florida law about a contract for services to be performed in Florida. Delaware has a comparatively slight interest in the matter.

The outcome is the same under the *Cryo-Maid* test.[230] The relative ease of access to proof and compulsory process for witnesses favor Florida, where most of the relevant parties are located. Practical matters also favor Florida since most of the evidence and persons with knowledge are likely located there. The applicable law likewise favors Florida, since Florida law governs the Services Agreement. And the Sarasota Action is already pending; it is merely stayed.

Accordingly, Counts VI and VII are appropriately dismissed without prejudice in deference to the Sarasota Action.

## III. CONCLUSION

Counts I through V are dismissed with prejudice under Rule 12(b)(6) for failure to state a claim. Counts VI and VII are dismissed without prejudice under Rule 12(b)(3) due to the forum selection clause in the Services Agreement and,

---

[230] *See Gramercy Emerging Mkts. Fund v. Allied Irish Banks, P.L.C.*, 173 A.3d 1033, 1036-37 (Del. 2017) (describing the *Cryo-Maid* factors: "(1) [t]he relative ease of access to proof; (2) the availability of compulsory process for witnesses; (3) the possibility of the view of the [premises], if appropriate; . . . (4) all other practical problems that would make the trial of the case easy, expeditious and inexpensive; . . . (5) whether or not the controversy is dependent upon application of Delaware law which the courts of this State more properly should decide than those of another jurisdiction"; and (6) "the pendency or nonpendency of a similar action in another jurisdiction" (citation omitted)).

alternatively, in deference to the Sarasota Action. Count VIII is dismissed with prejudice as waived.

The Complaint is therefore dismissed in its entirety.